Richard MAULE and the Union Federation of Teachers Local 4022, AFT, Appellants,

v.

INDEPENDENT SCHOOL DISTRICT NO. 9 OF TULSA COUNTY, Oklahoma; Richard Tallman, Alison Moore, Harold Reed, Darwin Maxey, and Vaughn Brower, individually and as members of the Board of Education of Independent School District No. 9 of Tulsa County, Appellees,

and

Union Classroom Teachers Association, Intervenor-Appellee.

No. 59645.

Supreme Court of Oklahoma.

Dec. 24, 1985.

Rehearing Denied Feb. 12, 1986.

Frederic N. Schneider, III, Boone, Smith, Davis & Hurst, Tulsa, Lana Jeanne Tyree, Oklahoma City, for appellants.

Rosenstein, Fist & Ringold by J. Douglas Mann, Tulsa, for appellees.

Karen L. Long, Gen. Counsel, Okl. Educ. Ass'n, Oklahoma City, for intervenor-appellee.

KAUGER, Judge.

This appeal was lodged after the trial court refused to issue a writ of mandamus compelling the Union Board of Education (appellee-Board), to recognize the Union Federation of Teachers (appellants-UFT), as the bargaining representative for the teachers employed by Union School, Independent School District No. 9. The issue presented is the proper role of the Board in resolving the competing claims of rival labor organizations seeking to represent the teachers as their collective bargaining agent. We find that a local school board has an affirmative obligation to participate in the settlement of unresolved disputes between competing bargaining organizations, and that its responsibility to resolve an apparent impasse is prescribed by 70 O.S.Supp.1982 § 509.2.[1] We reach this conclusion because the alternative is to permit the application of a special law to teachers in only two school districts (in two counties) while denying the statutorily conferred benefits to the other six hundred and thirteen school districts[2] (in seventy-five counties). This alternative is constitutionally unacceptable.

Union Classroom Teachers Association (intervenor-appellee-UTCA) has been the sole bargaining agent for the professional educators[3] at Union School since 1973. At

---

1. The guidelines are provided in 70 O.S.Supp. 1982 § 509.2:

"The local board of education shall recognize a professional organization that secures authorization signed by a majority of the professional educators designating said organization as their representative for negotiations. The members of the professional organization shall be professional educators employed by and serving in the district they propose to represent. Designation of the bargaining representatives shall be made by the recognized organization. Any person who desires not to be represented by any organization, as provided in this section, may so state in writing to his board of education.

However, all school districts with an average daily attendance of thirty-five thousand (35,000) or more shall adopt the following method for choosing the professional organization:

A. Local boards of education shall recognize an employee organization designated by an election of the employees in an appropriate bargaining unit as the exclusive representative of all the employees in such unit. The recognition of such employee organization shall be made by the local board no later than fourteen (14) days after said election.

B. 1. Within fourteen (14) days of the receipt of an employee petition filed by or on behalf of twenty-five percent (25%) or more of the employees in a unit, such petition calling for an election to determine which, if any, employee organization represents the employees in a bargaining unit, the local board of education shall verify all names appearing on the petition. The board shall verify that the names are those of bona fide members of the unit and that the challenging numbers are correct.

2. The petition calling for the secret ballot election shall contain only the names of employees of the bargaining unit who have signed and dated said petition. The time for signing the petition shall be within thirty (30) days of the first day of classes. Provided, the first day of classes shall serve as the beginning date for all subsequent petition drives.

3. Any employee in the bargaining unit shall have the right to challenge the validity of any or all names appearing on the petition. Such challenge shall be filed with the local board of education no later than five (5) days after receipt of said petition. After the challenge period expires and the petition is validated by the local board as having the sufficient percentage of names, the local board shall call for a secret ballot election.

C. 1. The election shall be held not less than thirty (30) days nor more than forty-five (45) days after the receipt of the petition, to determine which, if any, employee organization shall legitimately represent the unit. No election shall be directed to be held by a local board in a bargaining unit within which a valid election was held in the preceding two (2) years...."

2. Oklahoma has 615 school districts. See 1983–84 Annual Report of the Oklahoma State Dept. of Education, Vol. 3, p. 2.

3. The term professional educators is defined by 70 O.S.1981 § 509.4 as:

"Professional educators shall be defined as certified public school teachers. Provided, principals and assistant principals in all school districts with an average daily attendance of fifteen thousand (15,000) or more shall constitute a separate entity for purposes of collective bargaining but shall be subject to the same procedures and regulations set forth in this act for professional educators."

a school board meeting on December 11, 1981, UFT sought recognition as the exclusive representative, alleging that it was the majority organization. UFT supported this assertion by submitting a document from a certified public accounting firm stating that UFT possessed authorization cards signed by a majority of the teachers. Because the accounting firm was unable to determine either the exhaustiveness of the list or the validity of the signatures, it declined to certify the statement. A few days later, the UCTA submitted a similar statement, which was also uncertified—for the same reasons. For the next five months, UFT's requests to present its claim for recognition at a Board meeting were repeatedly denied. However, at each Board meeting, UFT offered, from the floor, to submit its signed authorization cards to a neutral third party for verification. Each time, the Board refused. The Board also refused to sanction an election [4] requested by UFT to choose a bargaining representative.

The Board, nonetheless, allowed UTF to hold an "election" on school premises. The election was an exercise in futility, in part because of the Board's "hands-off" policy, and in part because of a boycott encouraged by UCTA. As a consequence, less than 50% of the teachers voted. (161 out of 361) UFT subsequently sought a writ of mandamus to compel the Board to recognize it as the teachers' representative. The trial court issued an alternative writ of mandamus on April 14, 1982, ordering the Board either to recognize UFT or to appear before the Court on May 20, 1982, and show cause for its refusal to do so. After UFT presented its evidence at the May hearing, the Board's demurrer to the evidence was sustained because UFT's authorization cards were not certified, and because the court could not discern the number required for majority representation.

The application for mandamus was denied and the previously issued alternative writ was dissolved. The Court of Appeals affirmed the trial court's decision.

## A LOCAL SCHOOL BOARD HAS AN AFFIRMATIVE DUTY TO PARTICIPATE ACTIVELY IN THE SETTLEMENT OF RECOGNITION DISPUTES BETWEEN COMPETING LABOR ORGANIZATIONS UNDER THE PROCEDURAL GUIDELINES CONTAINED IN 70 O.S.SUPP.1982 § 509.2

Issuance of a writ of mandamus requires a clear legal right vested in the petitioner, refusal to perform a plain legal duty which does not involve the exercise of discretion, the adequacy of the remedy provided by the writ, and, the inadequacy of other relief.[5] To determine whether UFT has a legal right which is sufficiently clear to invoke mandamus, we must examine 70 O.S.Supp.1982 § 509.2.[6]

### A.

A legal right to be recognized as the bargaining representative vests in an organization if it is so designated by a majority of the professional educators within a school district. UFT alleges that it represents a majority of the educators; the evidence presented in the trial court does not indicate otherwise. On the contrary, the superintendent of Union Public School testified that an up-to-date list of the certified employees of the Union public schools, as of December, 1981, was given to UFT. According to the list, there were 361 teachers in the district *exclusive of administrators and supervisory personnel*. After comparing the signed negotiation authorization cards with the list provided by the Board, UFT's accountant concluded that over 50%

---

4. A sanctioned election is one held with official permission of the Board the outcome of which the Board ratifies. *Johns v. Allen*, 231 F.Supp. 852, 857 (D.Del.1964).

5. *Draper v. State*, 621 P.2d 1142, 1147 (Okla. 1980); *State Highway Comm. v. Green-Boots*

*Const. Co.*, 199 Okl. 477, 187 P.2d 209, 217 (1947); *Witt v. Wentz*, 142 Okl. 128, 286 Pac. 796–97 (1930).

6. See note 1, supra.

of the 361 professional educators listed had signed UFT negotiation authorizations. UCTA contends that it also has a majority, because under the same guidelines, its accountant determined that it possessed signed negotiation authorizations for more than 50% of 387 names on a list of certified employees, provided by the administration *including administrators and supervisory personnel.*

Definition of the composition of the appropriate bargaining unit necessarily precedes the determination of majority status.[7] The testimony presented in the trial court reflects that at the time UFT attempted to gain recognition from the Board, administrators and supervisors were not included in UCTA's bargaining unit—the negotiations agreement between the UCTA and the Board expressly *excluded* per diem and hourly employees as well as administrative and supervisory personnel.[8]

The federal courts have held that if a union and employer enter into a stipulation defining the bargaining unit, the National Labor Relations Board is bound by the stipulated terms.[9] Although the source of this principle is federal decisional law construing federal legislation, it is appropriate to consider federal rulings involving a parallel legislative scheme,[10] especially where the maxim involved—parties to a contract may be bound by the stipulated terms thereof—has been recognized by this Court. The analogous federal case law cited is used only for guidance in an area where there is a paucity of local law, and not because this Court feels compelled to follow federal precedents.[11] The National Labor Relations Act provides that representatives selected by the majority of the employees shall be the exclusive representative for the employees for the purposes of collective bargaining.[12] This provision is similar to 70 O.S.Supp.1982 § 509.2 which requires the local board of education to recognize a professional organization which secures authorizations signed by a majority of the professional educators as their representative for negotiations with the school district.[13]

The Board contends that it had lawfully recognized UCTA nine years earlier, that there was a currently valid and effective negotiations agreement, and that, therefore, UCTA should not be required to submit its cards to a neutral third party for verification. Majority support, however, is

---

7. *NLRB v. SAC Const. Co., Inc.,* 603 F.2d 1155, 1157 (5th Cir.1979).

8. The Negotiation Agreement § 1 provides in part:
   "The Board recognizes the Association as exclusive representative of all regularly appointed certified public schoolteachers of the Union School District *except those employed* on a per diem or hourly basis or those designated *by the Board to hold positions which it classifies as administrative or supervisory....*"

9. *N.L.R.B. v. Sonoma Vineyards, Inc.,* 727 F.2d 860, 865 (9th Cir.1984); cert. denied —— U.S. ——, 105 S.Ct. 130, 83 L.Ed.2d 71 (1984). This same principle, that the parties may stipulate to the composition of the bargaining unit, has been cited with approval in the public sector bargaining context as well. See e.g. Connecticut State Board of Labor Relations, Twenty-First Annual Report 1–3 (1967).

10. *Stone v. Johnson,* 690 P.2d 459, 462 (Okla. 1984); See also *Burlington Fire Fgtrs v. City of Burlington,* 142 Vt. 434, 457 A.2d 642–43 (1983).

11. *Michigan v. Long,* 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201, 1214 (1983);

*New Jersey v. Haskell,* 100 N.J. 469, 495 A.2d 1341 (1985).

12. The National Labor Relations Act § 9, 29 U.S.C. § 159 (1973) provides in part:
   "(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: Provided, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: Provided further, That the bargaining representative has been given opportunity to be present at such adjustment...."

13. See note 1, supra.

not an immutable factor; when it shifts, the identity of the bargaining representative will shift as well.[14] While policies of stability in collective bargaining relationships are important, they must be balanced against the right of employees to change their bargaining representative if they so desire.[15] There is a stabilizing counter-balance in the system—the frequency of secret ballot elections is limited to one every two years.[16] Because every fact favorable to the party against whom the demurrer is directed, together with all reasonable inferences which may be drawn therefrom, is admitted as true by a demurrer to the evidence, and all conflicting evidence is disregarded;[17] it appears *prima facie* that UFT may have a majority and a legal right to be recognized.

### B.

■ The Board refused to perform a plain, legal, non-discretionary duty. The recognition statute provides that the Board shall recognize a (majority) professional organization.[18] The use of the word "shall" by the legislature imposed a legal duty on the school board.[19] The statute also provides a means for determining disputed claims for recognition as the bargaining representative. No legislatively mandated method is supplied for the selection of a bargaining representative as between competing labor organizations when the average daily attendance of the school district is *below* 35,000. However, if the average daily attendance is 35,000 *or more*, a procedure is provided to determine the representative. Only two school districts in Oklahoma meet this criterion: Oklahoma City and Tulsa.[20] (For the school year of 1981–1982 Union school district had an attendance of 6,140.)[21]

All parties to this appeal have argued that the use of authorization cards to determine representation status between competing labor organizations is not within the purview of 70 O.S.Supp.1982 § 509.2, and that the ambiguity of the statute is responsible for the present impasse. Without expressing ourselves as to the accuracy of that assessment, having reviewed the provisions of § 509.2, which provide that upon receipt of an employee petition, the Board shall call a secret ballot election,[22] we find

**14.** *NLRB v. SAC Const. Co., Inc.,* see note 7, supra.

**15.** *Wauwatosa Board Of Education,* WERC Decision No. 8300 A. Aff'd 1 PBC p. 10, 303 (Wisc. Cir.Ct.1968).

**16.** See note 1, supra.

**17.** *Thompson v. Presbyterian Hosp. Inc.,* 652 P.2d 260, 262 (Okla.1982); *Neese v. Shawnee Medical Center Hospital,* 626 P.2d 1327, 1331 (Okla.1981); *Jordan v. General Motors Corp.,* 590 P.2d 193, 196 (Okla.1979); *Martin v. Stratton,* 515 P.2d 1366, 1368 (Okla.1973).

**18.** See note 1, supra.

**19.** *Oldham v. Drummond Bd. of Ed. of Ind. Sch. Dist. # 1–85,* 542 P.2d 1309, 1311 (Okla.1975), *State v. Hunt,* 286 P.2d 1088, 1090 (Okla.1955).

**20.** See note 1, supra.

**21.** *Oklahoma State Department of Education 1981–82 Annual Report,* p. 247.

**22.** An alternative to a secret election is the submission of the cards to an independent third party. In *Ass'n of Classroom Teachers of Moore v. Bd. of Ed.,* 567 P.2d 979, 982 (Okla.1977) we held that an offer to submit authorization cards was a reasonable means to prove majority status. The Association prevailed because the trial court appointed officers to examine and verify the signed authorizations. This was not an abuse of the trial court's powers in *Moore,* nor would it have been inappropriate in this case. We recognize that inherent authentication problems are compounded when the cards of two organizations are involved. It was presumably for this reason that the Legislature enacted the election procedures of § 509.2. The specific issue raised in *Moore* was whether a school board, in fulfilling its statutory duty under 70 O.S. § 509.2 to recognize professional organizations which have secured signed authorizations by a majority of professional educators, can demand that it personally review and examine the signed authorizations, rather than submitting the signed authorization cards to an independent third party for examination. In *Association of Class. Teach. v. Independent S.D. # 89,* 540 P.2d 1171 (Okla.1975), the bargaining agent was not challenged by a contender, and the bargaining agreement contained a provision for the appointment of a neutral third party to serve on the committee if a conflict arose on contract negotiations. The bargaining agree-

that a secret ballot election is a more fair and efficacious means of determining the bargaining representative where that status is at issue. The election process can result in only one majority organization because teachers can vote only once. The submission of authorization cards may create more than one apparent "majority" because there is no limitation on the number of authorization cards a teacher can sign. This may pose a temptation to school boards to decide unilaterally which bargaining organization should be recognized. Such a result is hardly consistent with the stated policy of the Act as set forth in 70 O.S.1981 § 509.1—to create an orderly system for regulating professional associations.[23]

A principal object of statutory construction is to determine the legislative intent [24] from an analysis of the whole act.[25] Details are often omitted from legislative enactments which must be supplied by implication to avoid interminability in the drafting of legislation. In ascertaining and giving effect to the legislative will,[26] inept or incorrect choice of words in a statute will not be construed and applied in a manner which would destroy the real and obvious purpose of the statute.[27] The legislature apparently either failed to anticipate representation disputes between labor organizations in over 99% of the "smaller" school districts, or it intended a representation

election to be available to them as well. The problem before us is not one of language analysis because of an unclear norm but rather one of a lacuna, a non-existent norm—a gap in the law.[28] Without clear and internally consistent procedural guidelines, the legislative purpose expressed in § 509.1, to lend coherence to the regulation of labor relations in public education, would be meaningless.[29] The overriding legislative intent is the desirability of some orderly process for regulating collective bargaining in education.

Our refusal to utilize the election procedure for teachers in this case, merely because the average number of students in daily attendance falls below an entirely arbitrary norm, would be tantamount to judicial condonation of avoidable labor unrest and the inevitable and continuous disruption of public education in the Union School District, and potentially in others like it. Failure to recognize § 509.2 procedures would result in an unreasonable application of a special law. This would be especially ironic in this instance because Union School District is located in Tulsa County and is contiguous to one of the two districts favored by the law. Unequal application of the Act to the teachers in Tulsa County, based irrationally on the vagaries of the situs of their employment, violates the Okla. Const. art. 5, § 46 [30] and art. 5,

---

ment in this case does not contain this provision. Also see, note 1, supra.

**23.** The purpose is provided in 70 O.S.1981 § 509.1:
"It is the purpose of this act to strengthen methods of administering employer-employee relations through the establishment of an orderly process of communications between school employees and the school district."

**24.** *Oklahoma City News Broadcasters Ass'n v. Nigh*, 683 P.2d 72, 75 (Okla.1984); *Walker v. St. Louis-San Francisco Ry Co.*, 671 P.2d 672-3 (Okla.1983); *Jackson v. Independent School Dist. No. 16*, 648 P.2d 26, 29 (Okla.1982).

**25.** *Midwest City v. Harris*, 561 P.2d 1357-58 (Okla.1977); *Adams v. Fry*, 204 Okl. 407, 230 P.2d 915, 917 (1951).

**26.** *Smull v. Delaney*, 175 Misc. 795, 25 N.Y.S.2d 387, 395 (1941). Also see, 2B Sutherland, "Stat-

utory Construction", p. 600, § 55.02 (4th ed. 1984).

**27.** *Wooten v. Hall*, 442 P.2d 334, 336 (Okla. 1968); *Bd. of Ed. of City of Okmulgee v. State Bd. of Ed.*, 201 Okl. 32, 200 P.2d 394, 397 (1948).

**28.** R. Aldisert, "Hard Core Judicial Process Problems Facing Judges in the 80's", p. 34 (1982).

**29.** See note 23, supra.

**30.** Special laws prohibited by the Okla. Const. art. 5, § 46 are those which do not have a uniform operation and which apply to less than the whole of a class of persons, entities or things standing upon the same footing or in substantially the same situation or circumstances. *Okla. City v. Griffin*, 403 P.2d 463, 465 (Okla.1965); *Fenimore v. State*, 200 Okl. 400, 194 P.2d 852, 854 (1948). The Constitution provides:

§ 59.[31] These provisions of the Oklahoma Constitution absolutely and unequivocally interdict the enactment of any local or special law which permits non-uniform regulation of school district affairs. The Legislature may not deal with any phase of public school administration other than by a statute which has general statewide application.[32]

Discrimination between teachers employed by school districts based solely on population offends art. 5 § 46.[33] It is a well-accepted rule of statutory construction that a presumption of constitutionality must be applied. If a statute is susceptible of two constructions, one which will uphold the Act and its constitutionality, while the other will strike it down, it is our duty to apply the former course.[34] Therefore, to give effect to the intent of the legislature we must use the procedures outlined for the school districts of 35,000 or more, and apply it to the school districts with less than that number.

### C.

▇ The last elements necessary before a writ of mandamus can be issued are the inadequacy of other relief and the efficacy of this writ. The statute provides no sanctions for violations of its provisions.[35]

Mandamus may well be the only adequate remedy. The Board has an affirmative duty to participate in the settlement of the dispute as to the legitimate bargaining representative [36] under the procedural guidelines set forth in 70 O.S.Supp.1982 § 509.2, especially when its recalcitrance and apparent favoritism have contributed so significantly to the present, disruptive impasse. Were we to hold otherwise, its intransigence could frustrate indefinitely the will of the majority of educators. Issuance of the writ properly would compel the board to act.[37]

This cause is reversed and remanded to the trial court for further proceedings not inconsistent with this opinion.

### REVERSED AND REMANDED

DOOLIN, V.C.J., and HODGES, OPALA and ALMA WILSON, JJ., concur.

SIMMS, C.J., concurs in part and dissents in part.

LAVENDER, HARGRAVE and SUMMERS, JJ., dissent.

---

"The Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law authorizing:

. . . . . .

*Regulating the affairs of* counties, cities, towns, wards, or *school districts;* (Emphasis supplied)

. . . . .

**31.** Uniform application of general laws is prescribed by the Okla. Const. art. 5, § 59 which states:

"Laws of a general nature shall have a uniform operation throughout the State, and where a general law can be made applicable, no special law shall be enacted."

**32.** Opala, J., dissenting in *Ind. Schl. Dist. No. 89 of Okla. Co. v. Okla. City Fed. of Tchrs.,* 612 P.2d 719, 725–26 (Okla.1980). See also *Wilkinson v. Hale,* 184 Okl. 165, 86 P.2d 305, 307 (1939); *Union School District # 1 v. Foster Lumber Co.,* 142 Okl. 260, 286 Pac. 774–75 (1930); *Bradford v. Cole,* 95 Okl. 35, 217 Pac. 470, 472 (1923).

**33.** *Tulsa Exposition & Fair Corp. v. Bd. of Co. Com'rs.,* 468 P.2d 501, 505 (Okla.1970).

**34.** *Dickinson v. Perry,* 75 Okl. 25, 181 Pac. 504, 509 (1919).

**35.** Section, § 509.1 was amended in 1983 to provide that a district court has the power to grant relief to the issuance of injunctions. This amendment became effective after this cause of action accrued, however, this remedy is inadequate because an injunction restrains a party from acting. *Sawyer Stores v. Mitchell,* 103 Mont. 148, 62 P.2d 342, 356 (1936).

**36.** *Association of Classroom Teachers v. Ind. Schl. Dist # 89,* 540 P.2d 1171, 1174 (Okla.1975).

**37.** The function of a writ of mandamus is provided in 12 O.S.1981 § 1451:

"The writ of mandamus may be issued by the Supreme Court or the district court, or any justice or judge thereof, during term, or at chambers, to any inferior tribunal, corporation, board or person, to compel the performance of any act which the law specially enjoins as a duty, resulting from an office, trust or station; but though it may require an inferior tribunal to exercise its judgment or proceed to the discharge of any of its functions, it cannot control judicial discretion."